Belknap
No. 80-070

## GEORGE P. TENTINDO, JR. *& a.*

v.

## LOCKE LAKE COLONY ASSOCIATION

September 10, 1980

*Normandin, Cheney & O'Neil,* of Laconia (*Robert A. Dietz* orally), for the plaintiff.

*Schroeder & McLetchie,* of Ossipee (*Erland C. L. McLetchie* orally), for the defendant.

KING, J.    This is an appeal from a declaratory judgment in an action brought by plaintiffs, purchasers of lots in a real estate development, to determine the legality of certain special assessments and liens imposed by an association created by the developer. The defendant, Locke Lake Colony Association (hereinafter association), in answer to the petition for declaratory judgment, filed a cross-petition asking for reformation of the deeds of conveyance, application of the cy pres doctrine, injunctive relief and damages. Trial before a Master (*Keller*, C.J., Ret.) resulted in

a judgment for all of the plaintiffs except George P. Tentindo and Ginette Tentindo. The relief sought by the defendant on the cross-petition was denied except for an injunction granted against the plaintiffs, George P. Tentindo, Jr. and Ginette Tentindo. The Court (*Loughlin*, C.J.) approved the Master's report.

In 1966 Locke Development Corporation (hereinafter corporation) began a housing development in Barnstead, New Hampshire, according to a common plan. At the present time, all but eight of the 1,220 lots in the development have been sold. The plaintiffs purchased their lots in the development during the period from 1969 to 1973. All of their deeds provided that the premises were conveyed subject to certain property restrictions and easements which were recorded; they further provided that "[a]lso conveyed herewith are beach privileges, and the right to use in common with others, the recreational facilities provided by Locke Development Corporation."

The restrictions and easements contained a provision that

> "In order to maintain and improve Locke Lake Subdivision, and particularly the recreation areas, beaches, parks, and to pay the administrative costs, labor and materials used for such purposes, commencing on the first day of June, 1966, and on the first day of May of each year thereafter, the Purchaser of each lot (or title holder) if the title has been conveyed, shall pay fifteen (15) dollars to Locke Development Corporation, its successors and assigns for such purposes."

Another provision declared that such charges should be a lien on the lot with respect to which the charges became due.

The corporation provided numerous community facilities or common areas including a man-made lake, beaches, tennis courts, a community lodge, a five-hole, par 3 golf course, a softball field, a basketball field, shuffleboard, croquet courts, a ski slope, horseback riding stables, swimming pools and a marina.

In 1970 the corporation played a major role in assisting lot owners to organize and operate the association. In fact, the corporation conducted the first meeting of the association and collected the first dues. The defendant contends that since 1966 it had been contemplated that the lot owners would form such an entity so that the corporation could convey property to the association and, in effect, turn over the management of the common areas to the lot owners. The by-laws of the association provide that, in addition to being able to assess the $15 annual

dues, the association may levy and collect "a special assessment . . . for the purpose of defraying in whole or in part, an operating loss or the cost of any construction or unexpected repairs or replacement upon the common property . . . ." Since 1972, the association has levied special assessments. From 1972 to 1979, these special assessments ranged from $27 to $75 yearly.

There is no dispute that the association, as successor to the rights possessed by the corporation, is permitted to collect an annual charge of $15 from lot owners by the express terms of the "Certificate of Locke Lake Subdivision—Property Restrictions and Easements" incorporated by reference into the deeds of all lot owners. There is no provision for increasing the $15 figure, and there is evidence in the record showing that the corporation made representations to both potential buyers and lot owners that this figure could not be increased. In fact, the corporation filed a report pursuant to the Interstate Land Sales Act of 1969 stating that it could make no special assessments. Moreover, the corporation admitted that it did not reserve the power to make special assessments, but, nonetheless, attempted to convey such authority to make these assessments to the association.

The first issue is whether the court erred in ruling that the association does not have the express or implied authority to impose a just and reasonable monetary assessment in excess of the annual $15 charge for the use of common areas from individual lot owners in the absence of a novation.

The trial court ruled that because the association, as successor, could take only those rights possessed by the corporation, it could not collect more than the $15 provided by the certificate or the individual deeds unless the plaintiffs agreed to the change, thereby creating a novation. The court found that only the Tentindos have assented to the change and are thus bound by that agreement.

■ The association first argues that because it has title to common areas, it therefore has authority to tax costs against a lot owner having a right to benefit from the common areas even if that lot owner chooses not to exercise that right. A landowner who is a member of an association having title to property which benefits the member's property is obligated to pay for a benefit received therefrom. *Sunapee Dam Corporation v. Alexander*, 87 N.H. 397, 181 A. 120 (1935). The obligation to pay, however, may be enforced only against voluntary members of the association, not those who benefit from the common area and who choose not to become members. *Id.*

In the instant case, the corporation, as a condition of sale,

required the owners and their successors to pay $15 each year for benefits provided by the corporation. In fact, the record supports the trial court's finding that the corporation, as an inducement to purchasing its properties, expressly represented that the $15 figure could not be increased. It was only when the association adopted its by-laws allowing an additional assessment that those members, by way of their membership, agreed to follow the by-laws of the association and thereby tacitly agreed to an additional assessment.

■ Although one who is entitled to become a member may enjoy an unfair advantage by abstaining from becoming one, the original certificate and deed failed to impose an involuntary membership in an association of lot owners created to take over management of the common areas. Instead, the corporation took it upon itself to convey to the association authority to require membership in the association. When the lot owners took title, they did not assume the agreement to become members of the association. Membership was therefore within the discretion of the lot owner. *See Sargent Lake Ass'n v. Dane*, 116 N.H. 19, 351 A.2d 54 (1976). Involuntary membership may not be imposed or assessments required even if an assessment adopted by the association is one determined on an equitable and fairly proportionate basis of benefit received. *See id.*

■ The association next argues that a quasi-contractual obligation to pay should be implied and that all lot owners, irrespective of membership in the association, are obligated to pay for the benefit received. Where there is a valid express contract between the parties, however, the law will not imply a quasi-contract. *Smith v. Stowell*, 256 Iowa 165, 171, 125 N.W.2d 795, 800 (1964); 17 C.J.S. *Contracts* § 6 (1963). In the instant case, an express contract exists and, accordingly, the terms of that agreement may not be varied by a legal fiction.

In setting up the development, the incorporators had the benefit of counsel and possessed real estate and banking experience. Although the corporation should therefore have anticipated the problem now raised here, the problem of continued maintenance remains. The association obtains its capital from annual dues and the special assessments. In 1972, the first budget voted on by the association was $37,525. It is presently $78,300. Taxes were initially $925 in the first year of operation and are now $3,000. Insurance in the first year was $1,428 and is presently $4,100. Utilities have increased from $2,715 to $4,500; salaries from

$16,300 to $37,000. Other expenses have also increased. The corporation is not a party to this action, and because its obligations are therefore not before us and because the corporation appears to be "basically insolvent", the problem of maintenance falls upon the association and lot owners.

■ In view of the foregoing, we hold that non-members of the association who have not assented to any special assessment need pay only the $15 annual dues as provided by deed. However, they are only entitled to the use of the common facilities existing prior to the transfer of these facilities to the association. Lot owners who do not pay the special assessment may be excluded from any new facilities undertaken by the association from funds received from lot owners above the total obtained from the $15 annual dues. Any lot owner or successor, however, may, at any later time, commence paying the then imposed special assessment and become a member of the association with all its rights, privileges and obligations.

The plaintiffs argue that there was not sufficient evidence to find that a novation had occurred with respect to plaintiffs, George P. Tentindo, Jr. and Ginette Tentindo, so as to require those plaintiffs to pay the special assessments imposed and enforced by the association.

■ Assent to the terms of a novation need not be shown by express words, but may be implied from the facts and circumstances attending the transaction and conduct of the parties. *Clark v. General Cleaning Co.*, 345 Mass. 62, 185 N.E.2d 749 (1962); 58 AM. JUR. 2d *Novation* § 16 (1971). The trial court found, "on all the evidence, with particular reference to the fact that the Tentindos paid all of the special assessments, except the one for 1978, that the Tentindos did assent to the change, and that they are now bound by it."

■ When the association was created it offered, in effect, to continue on with the functions of the corporation by maintaining and operating the common areas. Notices were sent out to lot owners who were also provided with a copy of the by-laws. The by-laws gave the association sole ability and authority to ask for and enforce the collection of special assessments from the various lot owners in the development. By sending out by-laws to the lot owners, it was offering to enter into a new agreement with persons such as the Tentindos. The Tentindos knew of, took part in and voted at all the annual meetings held by the association in 1973, 1974 and 1975. Accordingly, we find sufficient evidence on the

record to support the trial court's finding that a novation had occurred.

■ Tentindo argues that he paid the assessment under duress because, as he testified, although he believed the special assessments to be illegal, he feared the imposition of a lien on his property and claimed he did not have the financial resources to fight it. He contradicts this testimony later, however, by noting that he did not feel obligated to pay, but paid voluntarily. Whether Tentindo felt impelled to pay the assessment or did so voluntarily is not at issue here. The intent of parties in entering an agreement is to be judged by objective or external criteria rather than by unmanifested states of mind of the parties. *Kilroe v. Troast,* 117 N.H. 598, 601, 376 A.2d 131, 133 (1977). The trial court must determine the intentions of the parties based upon the evidence taken as a whole. *Id.* We find sufficient evidence to uphold the trial court's finding.

■ ■ The Tentindos argue that the novation is not enforceable because of the lack of a writing which the Tentindos assert is required under the statute of frauds. RSA 506:1. Where there has been a part performance of the agreement, however, the case is taken out of the Statute of Frauds. *See Weale v. Massachusetts Gen. Housing Corp.,* 117 N.H. 428, 374 A.2d 925 (1977); 37 C.J.S. *Statute of Frauds* § 255 (1943). Here, the Tentindos took part in the association's meetings, voted at the meetings and paid all the special assessments except for the year 1978. We therefore hold that the trial court was correct in finding a contract existed despite the absence of a writing.

We do not determine the responsibility of the corporation, which is not a party to this proceeding, to the lot owners; nor do we determine the responsibility of any lot owners, whether or not members of the association, for any injuries, damages or liabilities claimed by third parties who use the common facilities.

*Exceptions overruled.*

All concurred.